UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK                           For Online Publication Only
-----------------------------------------------------------------------X
IN THE MATTER OF:

                                                       **MEMORANDUM & ORDER**
                                                       14–CV–1979 (JMA)

In the Complaint of Rockaway Jet Ski, LLC as
Owner Of Two 2013 Yamaha Model VX1100A-M
Personal  Watercrafts, Bearing Hull ID Numbers:
US-Yama3184L213 and  US-Yama3885D313  For
Exoneration From or Limitation of Liability,

                              Petitioner.
-----------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Respondent Marianna Heckman was injured on a jet ski that she rented from petitioner
Rockaway Jet Ski, LLC ("Rockaway Jet Ski" or "RJS").  After Heckman sued RJS in New York
State Court, RJS brought the instant Limitation of Liability proceeding under federal admiralty
law.  Currently pending before the Court is RJS's motion for summary judgment based on liability
waivers that Heckman signed before renting the jet ski.  For the reasons stated below, RJS's motion
is granted in part and denied in part.  The releases signed by Heckman do not preclude negligence
or seaworthiness claims premised on a violation of New York Navigation § 73-a(2) or claims of
gross negligence.  The releases, however, do bar any other claims raised by Heckman.  Although
the gross negligence claim survives the release, it fails on the merits.

## I.      BACKGROUND

### A.  The Accident

RJS rents personal watercraft in Rockaway Beach, New York.  (Heckman 56.1 ¶ 1.)  RJS
is located on Jamaica Bay; a bar is also located on the same premises.  (RJS Reply 56.1 ¶ 7.)

Under New York Navigation Law § 73-a(2), businesses that rent personal watercraft:  (1) must provide a video or in-water demonstration of how to safely operate the watercraft; and (2) are not permitted to rent a personal watercraft to an individual unless that individual demonstrates the ability to operate the personal watercraft and use applicable safety equipment.

On June 23, 2013, Eduardo Petro rented two jet skis from RJS—one for himself and one for his friend, Heckman.  (Heckman 56.1 ¶¶ 2, 13; Intoccia Decl. Ex. G.)  Before renting the jet skis, Petro and Heckman had to sign various documents, including liability waivers.  These documents are discussed further below.

According to Heckman, an RJS employee told her and Petro where they were allowed to drive the jet skis, but did not provide any additional verbal instructions about how to operate the jet skis.[1]  (Heckman Dep. 102.)

After Heckman and Petro had been riding for about two to four minutes, Petro's jet ski collided with Heckman's and injured her.  (Heckman Dep. 112–13.)  At the time of the accident, they were approximately 900–3,000 feet from RJS's dock.  (RJS 56.1 ¶ 27.)

Prior to taking the jet skis out, both Heckman and Petro executed three documents:  (1) a "Waiver and Release of Liability," (Intoccia Decl. Exs. A, D.); (2) a "Waiver and Indemnity Agreement," (id. Exs. B, E.); and (3) a document entitled "Personal Watercraft Rules, Regulations Operator Orientation Checklist" (the "Checklist"), (id. Exs. C, F).[2]  (See also Heckman 56.1 ¶¶ 3,

---

[1]  Other witnesses, including Petro and employees of RJS, provided contrary testimony.  For example, Petro testified that an RJS employee spent two to three minutes telling him how to operate the jet ski.  (Petro Dep. 71–72.)  According to Petro, the employee "show[ed]" him and Heckman the jet skis, "showed us how to start it" and told them the area where they could operate the jet skis.  (Id. at 72.)  Petro,  however, also admitted that no one from RJS went out on a jet ski to observe the manner in which Heckman and Petro were operating their jet skis.  (Id. at 72.)

[2]  Heckman notes that, at Petro's deposition, he admitted executing some documents, but was not sure which documents he signed.  (Heckman 56.1 ¶ 4.)  That is insufficient to raise a factual dispute about whether Petro signed these documents.  More importantly, there is no question that Petro was given the safety Checklist and initialed that document.

5, 7, 8.)  RJS would not allow customers to rent jet skis without completing these documents. (Heckman 56.1 ¶ 26.)

Petro, a native Czech speaker, used a Czech interpreter during his deposition in this case. (Petro Dep. 12, Buchsbaum Decl. Ex. 6.)  At his deposition, Petro testified, at one point, that he "cannot read" the documents that he signed at RJS.  (Id. at 53–54.)  There is, however, no evidence in the record that Petro ever informed RJS that he was unable to read the documents.[3]

The "Waiver of Liability and Indemnity Agreement" signed by Heckman states, in relevant part, that

> I . . . fully understand and accept that operating a [personal watercraft ("PWC") and other enumerated activities] are inherently dangerous activities and involve risk of damage to personal property, as well as dangers of serious bodily injury, including but not limited to permanent disability, paralysis, and even death.
>
> I fully understand these inherent dangers and risks may be caused by my own action or inaction as well as the actions or inactions of others . . . . I fully assume all such risks and responsibility and agree to indemnify, defend, release, forever discharge and hold harmless [Rockaway Jet Ski]. . . from any and all claims, . . . causes of action, . . . and liabilities of every kind that may arise from or are in any way related to my activities/actions while participating in use of a PWC . . . .

(Intoccia Decl. Ex. B.)

The Checklist is a document that includes various instructions and pictures about how to safely operate a PWC.  (Id. Ex. C.)  Heckman and Petro both placed their initials next to at least ten different instructions on the Checklist, including a section on avoiding collisions, which, inter alia, states "Do Not Release Throttle when trying to Steer."  (Id.)

**B.  Procedural History**

In December 2013, Heckman filed a Verified Complaint against Rockaway Jet Ski in Supreme Court, Queens County, alleging that Heckman was injured due to the "negligence,

---

[3]  Although Heckman points out that Petro cannot read English, Heckman does not argue that this point has any legal significance to the instant motion.

carelessness," "recklessness," and "willful and wanton disregard of [RJS]." (Supreme Court Compl. ¶¶ 12, 20–22, Intoccia Decl. Ex. H.) In March 2014, RJS filed the instant Complaint for Exoneration from or Limitation of Liability. (Compl., ECF No. 1.) In May 2014, the Court issued an order that stayed any related actions, including Heckman's state court suit, in light of the instant proceeding for Limitation of Liability. (ECF No. 5.) In the instant Limitation of Liability proceeding, Heckman filed a claim alleging that her injuries were "caused by the negligence within the privity and knowledge of [RJS] . . . ." (Claim ¶ 9, ECF No. 12.)

## II.   DISCUSSION

### A. <u>Standard for Summary Judgment</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585–87 (1986). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,' " while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Konikoff v. Prudential Ins. Co. of Am.</u>, 234 F.3d 92, 97 (2d Cir. 2000) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" <u>Marvel Characters</u>, 310 F.3d at 286 (citing <u>Matsushita</u>, 475 U.S. at 587; <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary

judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). The non-moving party must produce "significant probative evidence" demonstrating that a factual dispute does in fact exist, otherwise summary judgment is appropriate. Anderson, 477 U.S. at 249.

**B.  The Parties' Arguments**

RJS has moved for summary judgment, contending that the releases Heckman signed are enforceable under admiralty law and, thus, preclude her negligence claims.  Although Heckman does not contest that the releases would preclude an ordinary negligence suit, Heckman claims that two New York State statutes afford her additional protections and that, under both New York law and federal admiralty law, negligence claims based on those statutes cannot be waived in a release. Heckman contends that, under both New York and admiralty law, a plaintiff cannot waive a negligence claim that is premised on violation of a safety statute.

Heckman also contends that the releases she signed do not cover claims of gross negligence or unseaworthiness, a liability concept unique to admiralty law.  RJS responds that Heckman failed to plead a claim for gross negligence and that, in any event, the factual record shows that there was no negligence at all.

**C.  Validity of the Release Concerning Negligence Claims**

**1.  General Principles Applicable in Admiralty Suits**

The instant proceeding is before the Court under admiralty jurisdiction.  In admiralty cases,

5

federal maritime law generally governs substantive liability standards.  See O'Hara v. Celebrity Cruises, Inc., 979 F. Supp. 254, 256 n.1 (S.D.N.Y. 1997) ("[I]t remains settled law that the legal standards for substantive liability in maritime personal injury actions brought in federal court are set exclusively by federal maritime law."); Calhoun v. Yamaha Motor Corp., U.S.A., 216 F.3d 338, 351 (3d Cir. 2000) (holding that "federal maritime standards govern the adjudication of a defendant's . . . putative liability in an admiralty action brought pursuant to a state wrongful death/survival statute").

However, the "exercise of federal admiralty jurisdiction does not result in automatic displacement of state law." Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 545–46 (1995).  State law should not be applied in an admiralty case when the state law "'works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations.'" Am. Dredging Co. v. Miller, 510 U.S. 443, 452, 447 (1994) (quoting Southern Pacific Co. v. Jensen, 244 U.S. 205, 216 (1917)).  Conversely, state law may be applied "'where no applicable admiralty rule exists, where local and state interests predominate and where the uniformity principle is not crucial." Brozyna v. Niagara Gorge Jetboating, Ltd., No. 10-CV-602, 2011 WL 4553100, at *5 (W.D.N.Y. Sept. 29, 2011) (quoting Stanley v. Bertram–Trojan, Inc., 868 F. Supp. 541, 543 (S.D.N.Y. 1994)).  "'State law also applies where it supplements, but does not contradict, an admiralty rule that does not constitute a pervasive system.'" Id.

As the Supreme Court has acknowledged, "[i]t would be idle to pretend that the line separating permissible from impermissible state regulation is readily discernible in our admiralty jurisprudence, or indeed is even entirely consistent within our admiralty jurisprudence." Am. Dredging Co., 510 U.S. at 452, 454 (1994) (permitting state court to apply state law rules for forum

non conveniens in admiralty suit and explaining that "[u]nlike burden of proof (which is a sort of default rule of liability) and affirmative defenses such as contributory negligence (which eliminate liability), forum non conveniens does not bear upon the substantive right to recover, and is not a rule upon which maritime actors rely in making decisions about primary conduct—how to manage their business and what precautions to take").

When addressing a potential conflict between maritime law and state law, the Court applies the following analytical framework.  See, e.g., Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 314 (1955); Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981).  First, the Court considers established maritime rules in the relevant area.  Second, the Court considers what the relevant state law is.  The Court must then consider whether the relevant state law "works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations."  Am. Dredging Co., 510 U.S. at 447; cf. Diesel "Repower", Inc. v. Islander Investments Ltd., 271 F.3d 1318, 1323 11th Cir. 2001) ("If there is an admiralty-state law conflict, the comparative interest must be considered—they may be such that admiralty shall prevail or if the policy underlying the admiralty rule is not strong and the effect on admiralty is minimal, the state law may be given effect."  (quoting Steelmet, Inc. v. Caribe Towing Corp., 779 F.2d 1485, 1488 (11th Cir. 1986))).  If there is a state rule on point, but no admiralty rule, the Court must determine whether to adopt a distinct admiralty rule or whether to follow the state law rule.

### 2.  Exculpatory Releases under Maritime Law

"[T]he clear majority of federal cases . . . holds that operators of inherently risky marine recreational activities may contract to disclaim liability for their own negligence."  Brozyna, 2011 WL 4553100, at *4 (collecting cases).  Under federal maritime law, "a pre-accident waiver will

absolve an owner or operator of liability for recreational accidents taking place on navigable waters where the exculpatory clause '(1) is clear and unambiguous; (2) is not inconsistent with public policy; and (3) is not an adhesion contract.'" Id. (quoting Charnis v. Watersport Pro, LLC, No. 07-CV-623, 2009 WL 2581699, at *5 (D. Nev. May 1, 2009)).

Although Heckman does not contest that the releases she signed would bar a simple negligence suit, Heckman contends that two New York state statutes, N.Y. Navigation Law § 73-a(2) and N.Y. Navigation Law § 48 alter the analysis here. As explained earlier, under Navigation Law § 73-a(2), businesses that rent personal watercraft: (1) must provide a video or in-water demonstration of how to safely operate the watercraft; and (2) are not permitted to rent a personal watercraft to an individual unless that individual demonstrates the ability to operate the personal watercraft and use applicable safety equipment. Heckman also relies on Navigation Law § 48, which imposes vicarious liability on the owner of a personal watercraft if it is negligently operated by a person who uses it with the owner's permission. Heckman contends that any waiver of negligence claims premised on these statutes violates public policy and, thus, would be unenforceable under both New York law and admiralty law. The Court will first address Heckman's arguments concerning Navigation Law § 73-a(2).

### 3. Navigation Law § 73-a(2)

The critical question before the Court is whether an exculpatory clause can release negligence claims that are premised on the violation of a state safety statute. RJS largely ignores the question of what the New York rule is on this point and, instead, stresses that, in its view, federal admiralty law permits such a waiver and preempts any New York rule to the contrary. Heckman contends that both New York law and admiralty law are in her favor on this issue. The parties primarily rely on two decisions. Heckman asks the Court to follow the reasoning of

8

Tassinari v. Key W. Water Tours, L.C., No. 06-CV-10116, 2007 WL 1879172, at *1 (S.D. Fla. June 27, 2007).  In Tassinari, the court, sitting in admiralty, held that a liability waiver signed by the plaintiff could not bar a negligence claim premised on the violation of a Florida statute that is similar to N.Y. Navigation Law § 73-a(2).  Id. at *5.  RJS cites to Brozyna v. Niagara Gorge Jetboating, Ltd., No. 10-CV-602, 2011 WL 4553100, at *5 (W.D.N.Y. Sept. 29, 2011).  The details of Brozyna are discussed infra.

As addressed below, there is little New York case law or admiralty case law that addresses whether an exculpatory waiver can release negligence claims premised on the violation of a safety statute.  However, before delving into this issue further, it is appropriate to first consider a subsidiary question—in the absence of a release, would a federal court sitting in admiralty consider RJS to be per se negligent if it violated Navigation Law § 73-a(2), a state safety statute?[4]

In Tassinari, the court held that the "Pennsylvania Rule," which is admiralty's unique version of negligence per se, can be triggered by the violation of a state safety statute.  Tassinari, 2007 WL 1879172, at *2 (citing Complaint of Wasson, 495 F.2d 571, 583 (7th Cir. 1974); Protectus Alpha Nav. Co., Ltd. v. North Pacific Grain Growers, Inc., 767 F.2d 1379, 1382-83 (9th Cir. 1985)).  Tassinari believed that it was particularly appropriate for a court sitting in admiralty to rely on the Florida jet ski statutes at issue because those statutes were "enacted, in part, in response to an act of Congress intended to 'encourage greater State participation and uniformity

---

[4]  RJS largely ignores this subsidiary question, and instead focuses on the issue of how maritime law treats releases.  However, this subsidiary question undoubtedly has relevance to the ultimate question of whether a court, sitting in admiralty, should permit a plaintiff to waive negligence claims premised on a failure to comply with Navigation Law 73-a(2), a state statute.

At one point, RJS asserts, without citation to any authority, that the requirements of Navigation Law § 73-a(2) are so vague that it would be inappropriate to apply this state statute in an admiralty proceeding.  Specifically, RJS contends that § 73-a(2) does not address "the guidelines for instructions specific to first-time jetskiers, nor does it set forth requirements as to the experience level of the person providing the instruction."  (RJS Reply Br. at 8.)  This argument is not persuasive—the statute's requirement can be satisfied with a standard safety video.

in [recreational] boating safety efforts, and particularly to permit the States to assume the greater share of boating safety education, assistance, and enforcement activities.'" Id. (quoting 46 U.S.C. § 13102)).  Here, Heckman also relies on 46 U.S.C. § 13102 to argue that Navigation Law § 73-a(2) is not preempted by admiralty law.  Notably, RJS never even attempts to address the relevance of this statute, which indicates that Congress intended for the states to play a role in the regulation of recreational boat safety.  Furthermore, the Court fails to see how—particularly in light of 46 U.S.C. § 13102—Navigation Law § 73-a(2), which simply requires that the renters of recreational personal watercraft receive certain initial instructions and supervision, "interferes with the proper harmony and uniformity of [maritime] law in its international and interstate relations."  Am. Dredging Co., 510 U.S. at 452.  The Court agrees with the analysis of Tassinari—if Heckman had not signed the releases here, admiralty law would permit the Court to consider Navigation Law § 73-a(2) in adjudicating Heckman's negligence claim and would presumably apply the Pennsylvania Rule if RJS violated § 73-a(2).

The next question is whether New York and federal admiralty law preclude a plaintiff from releasing a negligence claim premised on the violation of a federal safety statute or state safety statute.  Neither party cites to any New York cases considering this precise question, and only one admiralty decision, Tassinari, appears to have addressed this issue.  Given the dearth of relevant New York and admiralty decisions on point, it is important to note that other jurisdictions considering this question have generally concluded that parties cannot waive negligence claims premised on the violation of a safety statute.  See, e.g., Tassinari, 2007 WL 1879172, at *5 (citing West Virginia law); Straw v. Aquatic Adventures Mgmt. Grp., Inc., No. 11-CV-102, 2011 WL 5008359, at *2 (N.D. Fla. Oct. 20, 2011) (holding that, under Florida law, waiver of negligence per se is not enforceable); Slowe v. Pike Creek Court Club, Inc., No. A. 08C-08-029PLA, 2008

WL 5115035, at *5 (Del. Super. Ct. Dec. 4, 2008) (indicating that, under Delaware law, a liability waiver that would release liability for actions that violate public health and safety regulations violates public policy); Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass. App. Ct. 17, 19 (1997) ("Even where simple negligence is alleged, our cases, for policy reasons, are cautious in enforcing releases against liability and in certain circumstances decline to do so: e.g., where a release attempts to shield a defendant from responsibility for violation of a statutory duty."); see also 57A Am. Jur. 2d Negligence § 55 ("[I]f an injury results from a violation of a statute that establishes a certain standard of conduct for the protection and benefit of the members of a class, an immunity contract or clause exculpating a defendant from liability for negligence is unenforceable as contrary to public policy."); 57A Am. Jur. 2d Negligence § 56 ("No person can, by agreement, exempt himself or herself from liability for negligence in the performance of a duty imposed upon him or her by law, especially a duty imposed upon him or her for the benefit of the public.  This rule certainly applies if the duty involved is one prescribed by statute."); but cf. Espinoza v. Arkansas Valley Adventures, LLC, 809 F.3d 1150, 1153 (10th Cir. 2016) (finding that, under Colorado's "relatively permissive public policy toward recreational releases," release was enforceable against negligence claim based on violation of statute that essentially codified the preexisting common law standard of care); Malecha v. St. Croix Valley Skydiving Club, Inc., 392 N.W.2d 727, 730–31 (Minn. Ct. App. 1986) (holding, in sky-diving suit, that the presence of federal regulations concerning parachute jumping, which "focus primarily, not upon the safety of the jumper, but on mitigating 'hazard[s] to air traffic or to persons or property on the surface'" did not bring release into exception for "public" or "essential" services that would bar enforcement, but not addressing whether the regulations at issue were violated or whether such violation would constitute negligence per se).

As explained below, the Court ultimately concludes that both New York law and admiralty law would concur with these decisions and preclude waiver of negligence claims premised on the violation of a safety statute.

With respect to New York law, Heckman does not cite any decisions directly on point. Instead, Heckman relies on the general principal that "[a]n agreement between two private parties, no matter how explicit, cannot change the public policy of this State." Pub. Serv. Mut. Ins. Co. v. Goldfarb, 53 N.Y.2d 392, 400 (1981).  Given the tenor of New York cases that strictly construe exculpatory clauses, it is doubtful that the New York Court of Appeals would depart from the apparent majority rule and conclude that plaintiffs can waive claims of negligence per se.  See Lago v. Krollage, 78 N.Y.2d 95, 99 (1991) ("In the absence of a contravening public policy, exculpatory provisions in a contract, purporting to insulate one of the parties from liability resulting from that party's own negligence, although disfavored by the law and closely scrutinized by the courts, generally are enforced, subject however to various qualifications."); see also Gross v. Sweet, 49 N.Y.2d 102 (1979); Northington v. Gospel Volunteers Inc., No. 04-CV-7589, 2007 WL 541700, at *4 (S.D.N.Y. Feb. 16, 2007).[5]

RJS contends that, irrespective of New York law on this issue, maritime law generally enforces liability waivers for negligence.  As noted earlier, under federal maritime law, "a pre-

---

[5] In Gross, a case involving a sky-diving accident, the New York Court of Appeals had an opportunity to address the question of whether a release is unenforceable against claims premised on violations of federal regulations.  However, the Court of Appeals ultimately did not reach this issue because the court concluded that the release, which "waive[d] any and all claims . . . for any personal injuries [arising] out of my learning, practicing or actually jumping from an aircraft" did not expressly state an "intention to exempt the defendant from liability" for negligence concerning training methods or furnishing safe equipment.  Gross, 49 N.Y.2d at 109.

In Northington, the plaintiff signed a waiver stating that she released the defendant "from any and all liability for any injury or death that may result from my use" of an indoor pool.  2007 WL 541700, at *2.  The plaintiff alleged that the defendant was negligent in variety of ways, including an alleged failure to comply with the New York Sanitary Code, which requires swimming pool operators to develop a written safety plan.  The court did not discuss whether negligence per se can be waived, but denied summary judgment, relying on the principle that "New York courts have in some circumstances rejected broad exculpatory clauses."  Id. at *4.

accident waiver will absolve an owner or operator of liability for recreational accidents taking place on navigable waters where the exculpatory clause '(1) is clear and unambiguous; (2) is not inconsistent with public policy; and (3) is not an adhesion contract.'" <u>Brozyna</u>, 2011 WL 4553100, at *4.  However, none of the cases cited by RJS address the question of whether federal maritime law will enforce a waiver that would preclude a negligence claim premised on the violation of a duty imposed by either federal or state statutes.  None of the cases cited by RJS involved situations in which the plaintiff claimed that a federal or state statute was violated.

Surprisingly, the only case that appears to have addressed this question is <u>Tassinari</u>, which reasoned that "[a] clause in an agreement exempting a party from tort liability is unenforceable on grounds of public policy if the agreement would exempt a party from liability arising from that party's failure to comply with a safety statute, as the safety obligation created by the statute for such purpose is an obligation owed to the public at large and is not within the power of any private individual to waive."  <u>Id.</u> (quoting <u>Johnson v. New River Scenic Whitewater Tours, Inc.</u>, 313 F. Supp. 2d 621, 631 (S.D. W.Va. 2004), and citing Restatement (Second) of Contracts § 195 comment a (1981)).[6]

RJS criticizes <u>Tassinari</u> because <u>Tassinari</u> only cites to West Virginia law and the Restatement of Contracts on this issue, and does not address any federal admiralty decisions.  However, in light of the discussion above, <u>Tassinari</u>'s reliance on these other sources is not surprising.  Given the apparent absence of an established admiralty rule on this question, it was appropriate for <u>Tassinari</u> to implicitly conclude that admiralty law would look to the prevailing

---

[6] Neither party cites any decisions addressing whether federal admiralty law permits a waiver that would preclude a negligence claim premised on the violation of a <u>federal</u> safety statute or regulation.

view under state law and to the general contract principles of the Restatement.[7]  The Court has no reason to believe that maritime law should adopt a different rule than the states that have addressed this issue and precluded waiver.

Admittedly, in some circumstances, federal maritime law may be less hostile to exculpatory waivers than the statutory or common law of certain states.  See Sander v. Alexander Richardson Investments, 334 F.3d 712, 716 (8th Cir. 2003) (finding that exculpatory waiver was enforceable under federal maritime law even though state law would have not enforced the waiver against plaintiff's negligence claim because, under state law, the language in the waiver was not specific enough); Hopkins v. The Boat Club, Inc., 866 So. 2d 108, 111–12 (Fla. Dist. Ct. App. 2004) (same); cf. Murley ex rel. Estate of Murley v. Deep Explorers, Inc., 281 F. Supp. 2d 580, 588–89 (E.D.N.Y. 2003) (applying admiralty law to enforce a liability waiver and reasoning that "[i]n maritime tort cases, 'federal maritime law governs the substantive legal issues' and 'exclusively sets substantive liability standards, superseding state substantive liability standards'") (quoting Cutchin v. Habitat, No. 98-CV-1679, 1999 WL 33232277, at *2 (S.D. Fla. Feb. 8, 1999)).  However, contrary to RJS's suggestion, the maritime cases it cites do not suggest that there is a such strong maritime policy in favor of enforcing exculpatory clauses that maritime law would depart from the approach taken by numerous state courts concerning releases and safety statutes.  Rather, the cases cited by RJS make clear that maritime law, like the regimes of many states, will not enforce exculpatory clauses that are inconsistent with public policy.  And, as detailed above, numerous jurisdictions have concluded that waiver of a negligence per se claim violates public policy.

---

[7]  RJS has not pointed to any authority indicating that admiralty law has a contrary rule, as applied to either federal or state safety statutes.  Nor RJS has cited a single decision where a court, applying state law, enforced a liability waiver that excused a defendant from complying with a safety duty imposed by statute.

RJS's argument turns, primarily, on the <u>Brozyna</u> decision—however, such reliance is misplaced.  In <u>Brozyna</u>, the plaintiff, who was injured on a jet boat excursion, executed a waiver releasing the excursion company from all potential liability.  The plaintiff contested the validity of the waiver, citing to N.Y. General Obligation Law § 5-326, which precludes the operators of certain recreational establishments, such as pools and gymnasiums from entering into negligence waivers with patrons.  The court refused to invalidate the plaintiff's waiver based on § 5-326, reasoning that:

> there is a clearly stated rule in maritime jurisprudence in favor of allowing parties to enter into enforceable agreements to allocate the risks inherent in marine recreational activities. In the absence of any showing by plaintiffs that the interests expressed in General Obligations Law § 5–326 should be found to predominate over the long-recognized national interest in the development of a uniform body of maritime law, the court finds no reason to disturb the commonplace practice of requiring participants in such activities to sign preaccident waivers of liability for damages arising out of the operator's negligence.

<u>Brozyna</u>, 2011 WL 4553100, at *5 (internal citations omitted).

According to RJS, there is "no material difference between" General Obligations Law § 5-326 and Navigation Law § 73-a(2).  That view is mistaken.  <u>Brozyna</u> presented a much easier conflicts issue and is distinguishable from the instant suit.  First, in <u>Brozyna</u>, there was a clear conflict between federal admiralty law—which, like the common law of many states, permits the enforcement of liability waivers subject to certain caveats—and General Obligations Law § 5–326—which, in derogation of the common law, completely precludes negligence waivers for certain classes of recreational activities.  As explained above, RJS has not shown that there is any conflict between state law and maritime law on the question of whether negligence waivers should be enforced when the negligence is premised on violations of a safety statute.  Second, unlike in <u>Brozyna</u>, where the court stated there was an "absence of any showing by plaintiffs that the interests expressed in General Obligations Law § 5–326 should be found to predominate over the

long-recognized national interest in the development of a uniform body of maritime law," here, Heckman has pointed the Court to 46 U.S.C. § 13102, which was not raised in Brozyna.  This statute—which RJS never even attempts to address—suggests that Congress intended for states to play a role in regulating recreational boat safety.  By contrast, Brozyna did not address 46 U.S.C. § 13102.  Moreover, unlike Navigation Law § 73-a(2), which is focused on recreational boating safety, General Obligations Law § 5–326 has broad application outside of the recreational boating context (and, in fact, may have limited application to recreational boating, see Dumez v. Harbor Jet Ski, Inc., 117 Misc. 2d 249, 251, 458 N.Y.S.2d 119 (N.Y. Sup. Ct. Niagra Cnty. 1981)).

For all of these reasons above, the Court concludes that the releases signed by Heckman cannot be enforced to preclude a negligence claim premised on a violation of Navigation Law § 73-a(2).

RJS also argues, in the alternative, that, if the release is not enforceable, no reasonable factfinder could conclude that RJS violated § 73-a(2).  Factual issues clearly preclude summary judgment on this ground.  Heckman's testimony indicates that she was given a cursory verbal instruction about where to operate the jet ski.  That instruction was insufficient to satisfy the requirements of Navigation Law § 73-a(2).

### 2.  Navigation Law § 48

Heckman also argues that public policy precludes her from waiving her vicarious liability claim against RJS premised on Navigation Law § 48.  The Court disagrees.

Navigation Law § 48 imposes vicarious liability on the owners of a personal watercraft if it is negligently operated by a person who uses it with the owner's permission.

Even if Heckman had not signed the exculpatory releases at issue here, any claim premised on Navigation Law § 48 would be preempted by admiralty law.  Navigation Law § 48 conflicts

with the standard for owner liability in limitation proceedings and the Court sees no reason to apply state law on this issue.  See Matter of Guglielmo, 897 F.2d 58, 61 (2d Cir. 1990) (explaining that petitioner in limitation of liability proceeding "has the burden of proving that he or she lacked knowledge or privity regarding the unseaworthiness or negligence"); cf. In re Hartman, No. 08-CV-5562, 2010 WL 1529488, at *4 n. 10 (D.N.J. Apr. 15, 2010) ("To the extent that [the claimant] argues that [the jet ski owner] is strictly liable under N.J.S.A. 12:7-74.1, the Court agrees with [the owner] that such a claim is preempted by general maritime law because the strict liability standard of N.J.S.A. 12:7-74.1 directly conflicts with the Limitation Act's negligence standard.").

Moreover, 46 U.S.C. § 13102, which encourages state regulation of recreational boat safety, has less relevance with respect to Navigation Law § 48.  Unlike Navigation Law § 73-a(2), § 48 does not impose any specific duties related to safety.  Navigation Law § 48's imposition of vicarious liability is less about boat safety and more about ensuring compensation for injured parties.  Cf. Morris v. Snappy Car Rental, Inc., 84 N.Y.2d 21, 27 (1994) (explaining that similar statute that imposes vicarious liability on automobile owners "was designed to ensure access by injured persons to a financially responsible insured person against whom to recover for injuries and to remove the hardship which the common-law rule visited upon innocent persons by preventing 'an owner from escaping liability by saying that his car was being used without authority or not in his business'") (citations and internal marks omitted).  As such, 46 U.S.C. § 13102 provides little justification for applying Navigation Law § 48, which conflicts with the traditional rules for owner liability in limitation proceedings.  And, Heckman does not cite to any admiralty decisions where the court applied a state statute that imposed vicarious liability on a

vessel owner, irrespective of the owner's fault, for the type of accident at issue here.[8]

Finally, even assuming arguendo that New York law would preclude waiver of a vicarious liability claim premised on § 48,[9] the Court does not believe state law should govern this issue or that maritime law would adopt a rule precluding waiver.  Again, unlike Navigation Law § 73-a(2), Navigation Law § 48 does not impose any affirmative safety duties.

## D.  Seaworthiness and Gross Negligence Claims

In a limitation of liability proceeding, if "a claimant can establish either that the vessel was unseaworthy—for instance, being operated by an incompetent crew—or that the accident was caused by negligence, a petitioner for limitation . . . then has the burden of proving that he or she lacked knowledge or privity regarding the unseaworthiness or negligence."  Guglielmo, 897 F.2d at 61 (citations omitted).

Heckman argues that the releases she signed do not cover a claim that Petro's jet ski was not "seaworthy" because the releases do not explicitly mention seaworthiness claims.  RJS does not explicitly address this argument.

---

[8]  Since 46 U.S.C. § 13102 does not provide a sufficient hook to justify applying Navigation Law § 48 in this admiralty proceeding, plaintiff is left to argue that the instant accident and the regulation of jet skis are so inherently local that state law should govern.  On this point, Heckman cites to the New York Court of Appeals' decision in Cammon v. City of N.Y., 95 N.Y.2d 583, 590 (2000).  In Cammon, the court held that New York Labor Law claims brought by an injured dock builder were not preempted by admiralty law, reasoning, inter alia, that the tort at issue was maritime but local.  Cammon, however, is clearly distinguishable from the instant case.  As the Court of Appeals stressed, the plaintiff in Cammon "was injured while on a floating raft on navigable waters, but at the same time the raft was anchored to a land-based transfer station, and the work at issue was repair to a land structure.  In a case such as this, our decision to affirm is influenced by the Labor Law's strong State interest in protecting workers."  Id. at 590.  The instant accident, which involved a collision involving two vessels that were hundreds (and possibly thousands) of feet from the dock, has a much more obvious connection to traditional maritime concerns than the incident in Cammon.

[9]  Heckman argues that Navigation Law § 48 cannot be waived because the New York Court of Appeals has concluded that a similar vicarious liability statute that applies to automobiles cannot be waived.  See Morris, 84 N.Y.2d at 27.  The Court doubts that New York courts would apply the same rule to waivers entered into by voluntary participants in risky recreational activities, such as renting jet skis.  Notably, Heckman has not provided any authority indicating that the common law of other jurisdictions precludes waiver of such statutory liability in the context of risky recreational activities.

Although federal maritime law requires that a release must be "clear and unambiguous," a release that covers "all claims" can be sufficient even if the release does not explicitly mention each specific type of potential claim.[10]  See In re Aramark Sports & Entm't Servs., LLC, No. 09-CV-637, 2012 WL 3776859, at *5 (D. Utah Aug. 29, 2012) ("[T]he clause does not need to use the term 'negligence' to be clear and unambiguous.  The phrase 'all claims' has been held to include negligence, and it logically follows that the similar phrase 'any claims' would include negligence by [defendant]."  (citations omitted)); Sander, 334 F.3d at 716 (8th Cir. 2003) ("The term 'any and all' used in the exculpatory clause is all-encompassing and leaves little doubt as to the liability from which the boat owners released the [defendant] Yacht Club.  We decline to accept the boat owners' invitation to require more than 'all' when the liability at issue stems from the Yacht Club's own negligence."); cf. Dominici v. Between the Bridges Marina, 375 F. Supp. 2d 62, 65 (D. Conn. 2005) (holding that exculpatory clause's "broad absolution of 'any and all liability,' specific reference to vandalism, as is at issue here, and implication that the limitation of liability holds even where the boat is in the care or custody of [defendant] or its agents, together plainly encompass liability arising from the [defendant's] own negligence").

The releases Heckman signed made clear that she released RJS from "any and all claims, . . . causes of action, . . . and liabilities of every kind that may arise from or are in any way related to my activities/actions while participating in use of a PWC . . . ."  That is sufficient to cover claims concerning seaworthiness.  Cf. Oran v. Fair Wind Sailing, Inc., No. 08-CV-34, 2009 WL 4349321, at *8, 12 (D.V.I. Nov. 23, 2009) (assuming that broad release that referred to "all" "claims" included seaworthiness claim).  Accordingly, Heckman released all seaworthiness claims, except

---

[10]  Heckman does not explicitly address whether federal maritime law or state law should govern this question.  However, her citation to the "clear and unambiguous" standard from federal maritime law is a concession that federal maritime law governs this question.  (See Heckman Opp. Br. at 8, 19.)

for a seaworthiness claim premised on a violation of Navigation Law § 73-a(2). The Court assumes that the latter claim cannot be released for the same reasons that claims of negligence per se cannot be released.[11]

RJS does not dispute that both admiralty law and New York law preclude parties from releasing gross negligence claims in pre-accident waivers. However, RJS contends that Heckman cannot pursue a claim of gross negligence here because she did not allege gross negligence in her state court complaint. RJS also argues that the facts elicited during discovery show that plaintiff cannot establish that RJS was negligent at all. Heckman contends that she adequately alleged gross negligence and that the record raises a question for the fact-finder on this issue.

The question of whether Heckman has properly alleged gross negligence in her state court complaint is a close one. Cf. Olmo v. Atl. City Parasail, LLC, No. 13-CV-4923, 2016 WL 1704365, at *6 (D.N.J. Apr. 28, 2016) (concluding that complaint failed to allege recklessness claim where complaint made passing references to reckless conduct under counts alleging negligence). Moreover, the Court notes that the claim Heckman filed in the instant limitation proceeding does not reference gross negligence or recklessness. (Claim, ECF No. 12.) In any event, as explained below, even if Heckman did adequately allege gross negligence, no reasonable factfinder could find that RJS was grossly negligent based on the instant record.

Neither party addresses the standard for gross negligence. Under New York law, "gross negligence is reckless conduct that borders on intentional wrongdoing and is 'differ[ent] in kind [and] degree' from ordinary negligence." Lemoine v. Cornell Univ., 2 A.D.3d 1017, 1020 (N.Y. App. Div. 3d Dep't 2003) (quoting Sutton Park Dev. Corp. Trading Co. v Guerin & Guerin Agency,

---

[11]  The parties do not address whether the violation of a safety statute has any relevance to a seaworthiness claim or whether maritime law recognizes a "per se" rule for seaworthiness claims where a safety statute has been violated. If necessary, these issues can be addressed further in advance of trial.

297 A.D.2d 430, 431 (N.Y. App. Div. 3d Dep't 2002)).  It does not appear that courts sitting in admiralty apply a materially different standard—in fact, admiralty courts have considered comparable state law in identifying the standard for gross negligence.  See Royal Ins. Co. of Am. v. Sw. Marine, 194 F.3d 1009 (9th Cir. 1999) (reviewing admiralty standard for gross negligence and citing to admiralty cases, California law, and Black's Law Dictionary).

As explained earlier, according to Heckman's testimony, she received a cursory verbal instruction about where to operate the jet ski, which was insufficient to satisfy Navigation Law § 73-a(2).  However, based on other undisputed facts in evidence, that violation alone is insufficient for a reasonable factfinder to find gross negligence.  Although Heckman's testimony indicates that RJS employees did not provide sufficient verbal instructions, it is undisputed that RJS did provide Heckman and Petro with a checklist explaining how to safely operate the jet skis— a checklist that both of them had to review and initial in at least ten separate areas.  In light of those undisputed facts, a reasonable factfinder could not find that plaintiff was grossly negligent.

Heckman argues that because there is a factual dispute about RJS's compliance with Navigation law § 73-a(2), the issue of gross negligence cannot be resolved on summary judgment. In support of this argument, Heckman contends that violation of a statutory duty necessarily creates a factual question on regarding gross negligence, citing to Waverly Properties, LLC v. KMG Waverly, LLC, 824 F. Supp. 2d 547, 550 (S.D.N.Y. 2011) (Marrero, J., adopting report and recommendation of Mass, M.J.).  Waverly, however, does not stand for this proposition.  In Waverly, the defendants argued that the plaintiff's claims of negligence and gross negligence should be dismissed because those claims were duplicative of the plaintiff's breach of contract claims.  The court rejected that argument, reasoning that since the defendants had an independent legal duty to adhere to the municipal building code, the plaintiff's negligence and gross negligence

claims were not duplicative of their contract claims. <u>Waverly</u> says nothing about what evidence is necessary to establish gross negligence and, in fact, never even cites the standard for gross negligence.

Given the undisputed facts about the safety checklist, no reasonable factfinder could conclude that RJS's violation of Navigation Law § 73-a(2) was sufficient to constitute gross negligence.

### III.    CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted in part and denied in part.

**SO ORDERED.**

Date:  December 19, 2016
Central Islip, New York

_____/s/ (JMA)_____
Joan M. Azrack
United States District Judge